IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SUSAN L. HARDY, | ) | CASE NO. 3:11CV543 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Susan L. Hardy ("Hardy") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her applications for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42

U.S.C. §§ 416(i) and 423, and Supplemental Security Income ("SSI") under Title XVI of the

Act, 42 U.S.C. § 1381 *et seq.*  Doc. 1.  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the following reasons, the final decision of the Commissioner should be

**AFFIRMED**.

## I.  Procedural History

On March 28, 2006, Hardy filed applications for DIB and SSI, alleging a disability onset

date of January 19, 2006. [1]  Tr. 142-49.   Hardy claimed that a combination of impairments,

including neck and back impairments, concentration and memory problems, depression,

headaches, and sleep issues, prevented her from working.  Tr. 142-49, 154.  The state agency

denied Hardy's claims initially on June 29, 2006 (Tr. 87-92), and on reconsideration on

December 13, 2006.  Tr. 99-101; 106-08.  On February 1, 2007, Hardy filed a written request for

---

[1] Hardy previously filed an application for DIB, which was denied by another Administrative Law Judge in January 2006.  Tr. 71-80.  Hardy did not appeal that denial of benefits.  Tr. 71-80.

a hearing (Tr. 114) and, on March 5, 2009, a hearing was held before Administrative Law Judge Bruce H. Zwecker (the "ALJ").  Tr. 19-50.  In a decision dated August 28, 2009, the ALJ determined that Hardy was not disabled.  Tr. 5-32.  Hardy requested review of the ALJ's decision by the Appeals Council on October 2, 2009.  Tr. 7-18.  On January 28, 2011, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II.  Evidence

### A.  Personal Evidence

Hardy was born on September 10, 1963, and was 45 years old at the time of the administrative hearing.  Tr. 24.  She testified that she attained her high school G.E.D. and could communicate in English.  Tr. 24.  At the time of the administrative hearing, Hardy was divorced and lived in a house with her adult son.  Tr. 23, 27.

### B.  Medical Evidence

#### 1.  Treatment History

Hardy was treated by neurologist E. Tomas Calderon, M.D., for neck and shoulder pain, as well as headaches.  Tr. 238-51, 290-312.  On January 15, 2004, Hardy saw Dr. Calderon. Tr. 250–51.  Dr. Calderon noted that Hardy's headaches and neck pain "improved somewhat" with medication.  Tr. 250.  Upon examination, Dr. Calderon found that Hardy had normal motor tone, normal reflexes, and muscle strength of 5/5.  Tr. 250.  In a progress noted dated September 27, 2004, Dr. Calderon noted that Hardy "is a patient with chronic neck pain secondary to cervical radiculopathy and failed neck syndrome."  Tr. 246.  He also noted that Hardy was "doing better" with pain management and depression.  Tr. 246.

On a follow-up visit to Dr. Calderon on June 14, 2005, Hardy reported that she had ongoing pain, but that her medication regimen brought her pain "down to a more tolerable degree." Tr. 244. Dr. Calderon noted that Hardy had "chronic pain syndrome which is more myofascial in origin" and that her pain was "under fair control." Tr. 244. Physical examination revealed normal muscle strength, tone, and reflexes. Tr. 244.

Hardy saw Dr. Calderon again on January 27, 2006. Tr. 239–40. Hardy complained of pain and trouble falling asleep. Tr. 239. Dr. Calderon noted normal muscle bulk and tone, and muscle strength of 5/5 throughout. Tr. 239. He also noted that Hardy had normal gait. Tr. 239. X-rays of the cervical spine on March 2, 2006 revealed moderate degenerative disc disease at C6-7 and mild to moderate degenerative disc disease at C7-T1. Tr. 372.

Hardy also treated with Kiran Tamirisa, M.D., for pain management. Hardy saw Dr. Tamirisa on April 14, 2006, and stated that the onset of her cervical pain was in 1999 after she was involved in a car accident. Tr. 386. Hardy also reported to Dr. Tamirisa that she had surgical fusion surgery in November 2002. Tr. 386. Dr. Tamirisa assessed Hardy with cervical radiculopathy status post cervical fusion. Tr. 387.

On May 31, 2006, Damodar Reddy, M.D., examined Hardy. Tr. 321–23. He noted that Hardy complained of long-standing head, neck and bilateral upper extremity pain. Tr. 321. Dr. Reddy explained that recent cervical spine films suggested "perhaps moderate degenerative changes." Tr. 321. Dr. Reddy's described Hardy's pain as "primarily achy in nature with some burning dysesthesias." Tr. 321. Dr. Reddy noted that Hardy's range of motion was "slightly curtailed, particularly on the flexion." Tr. 322.

On July 18, 2006, Hardy saw Dr. Calderon and reported a "better response to pain medication." Tr. 296. She stated that her pain was "under better control" and examination

3

results were normal.  Tr. 297, 335.  Hardy also complained of insomnia.  Tr. 288, 297.  After conducting a polysomnogram, Dr. Calderon found that Hardy had moderate obstructive sleep apnea.  Tr. 288–89.  On August 7, 2006, Hardy presented to St. Luke's Hospital sleep disorder center and underwent a sleep study.  Tr. 371.  Findings were consistent with moderate obstructive sleep apnea and a trial nasal CPAP was recommended. Tr. 371.

On September 20, 2006, Hardy complained to Dr. Calderon of ongoing sleeping problems but partial relief in her neck pain.  Tr. 291–92, 332.  Examination results were again mostly normal.  Tr. 291–92, 332.  On October 26, 2006, Hardy underwent additional testing for sleep apnea at St. Luke's Hospital, which revealed "significant improvement of sleep architecture" and "no pathological obstructive sleep apnea."  Tr. 360.  Dr. Calderon recommended that Hardy use a nasal Bi-PAP for her sleep apnea.  Tr. 360.

Meanwhile, on August 9, 2006, Hardy saw Dr. Tamirisa and complained of neck pain that radiated into her head and upper extremities bilaterally. Tr. 326.  Hardy reported to Dr. Tamirisa that the pain was constant, but varied in intensity.  Tr. 326.  Dr. Tamirisa increased Hardy's prescription for Kadian and continued all other medications. Tr. 326-327.  On October 25, 2006, Hardy saw Dr. Tamirisa and reported that Kadian "is helping her pain better."  Tr. 384-85.  Dr. Tamirisa noted a 25% improvement in Hardy's pain level since her last visit.  Tr. 384.

On May 1, 2007, Hardy saw Dr. Calderon and complained of insomnia and neck pain. Tr. 328–30.  Hardy reported to Dr. Calderon that she slept better with a Bi-PAP at night.  Tr. 328.  Dr. Calderon noted that Hardy exhibited normal gait, strength, sensation, and reflexes upon examination.  Tr. 330.

Hardy had a follow-up appointment with Dr. Tamirisa on June 13, 2007, at which she complained of pain in her cervical area and headaches.  Tr. 382-83.  Hardy reported to Dr.

4

Tamirisa that her pain is aggravated when she tries to pick up or hold on to things, or when she holds her neck in one position for a long period of time.  Tr. 382.  She also stated that her sleep patterns had been poor due to pain.  Tr. 382.   Dr. Tamirisa noted that Hardy had missed a number of appointments.  Tr. 382.  Dr. Tamirisa recommended cervical epidural steroid injections for pain relief.  Tr. 382.

Hardy underwent a cervical epidural steroid injection for pain relief on July 18, 2007.  Tr. 339.  A few hours after the injection, Hardy complained of weakness in her arms and legs.  Tr. 338.  Dr. Tamirisa noted that Hardy's complaints were "rather vague" and examination results were mostly normal except for her complaints of diminished strength.  Tr. 338.  Dr. Tamirisa commented that "it wasn't very clear to me whether it is intentional v. real weakness as the weakness appeared to be somewhat cogwheeling."  Tr. 338.  An MRI revealed mostly normal results.  Tr. 338, 381.

Hardy presented to St. Luke's Hospital emergency room on April 15, 2008, for low back pain.  Tr. 352-55.  Hardy was treated with steroids, Decadron and Morphine.  Tr. 354.  X-rays of the lumbar spine demonstrated mild degenerative disc space narrowing at L5-S1 with some endplate spurs.  Tr. 352.  Hardy returned to the emergency room at St. Luke's Hospital on June 3, 2008, complaining of severe lower back pain, although she had driven herself to the hospital.  Tr. 349.  Hardy stated that the pain was in the right sacroiliac area with radiation down the back of the right leg. Tr. 349.  Hardy was given Demerol IM and Phenergan.  Tr. 34-50.

In October 2008, Hardy underwent a psychiatric evaluation by Satwant Gill, M.D.  Tr. 401–05.  Hardy informed Dr. Gill that she did not like being around people.  Tr. 401.  She also noted that she had not been taking all of her prescription medications regularly.  Tr. 402.  Dr.

Gill instructed Hardy to take all of her medication and continue with therapy.  Tr. 404–05.  In a follow-up visit on January 9, 2009, Hardy stated that medication was helping.  Tr. 398.

Hardy saw Dr. Tamirisa on June 21, 2009 for a follow-up appointment.  Tr. 373-74.  At that appointment, she complained of pain in the cervical area with pain radiating to the right leg and right upper extremity.  Tr. 373.  Hardy informed Dr. Tamirisa that her pain was constant, and was sharp, dull, burning, and aching in nature.  Tr. 373.  She also reported tingling, numbness, and weakness in both the lower and upper extremities.  Tr. 373.  Hardy stated that any type of activities aggravated her symptoms.  Tr. 373.  Dr. Tamirisa continued Hardy's medications and recommended an MRI of the lumbar spine.  Tr. 373-74.  The MRI revealed one disc protrusion but "otherwise apparent minor spondylosis with non-compressive disc bulges described segmentally."  Tr. 396.

### 2.    State Agency Physicians

On May 24, 2006, state agency physician Roger Avery, Ed.S., performed a consultative psychological evaluation of Hardy.  Tr. 253–60.  During that evaluation, Hardy expressed problems with depression and concentration, but acknowledged that she had never received psychotherapy services.  Tr. 255.  Dr. Avery noted no significant problems with flow of conversation, thought, insight, or judgment.  Tr. 257.  Hardy drove to the evaluation.  Tr. 257.  She informed Dr. Avery that she lived with her father and kept in touch with her four children.  Tr. 254–55.  She stated that she went shopping, handled her own finances, took care of her own personal needs, washed clothes, cleaned the house, and prepared meals.  Tr. 257.  Hardy also reported to Dr. Avery that, when she was in high school, she was enrolled in regular classes and that she obtained her G.E.D. in 1995.  Tr. 254–55.  She stated that she worked for four years as a waitress and two years in a factory.  Tr. 255.

Dr. Avery administered the Wechsler Adult Intelligence Scale – Third Edition.  Tr. 254.
Hardy scored a verbal IQ of 66, a performance IQ of 69, and a full scale IQ of 65.  Tr. 253.  Dr.
Avery also administered the Wechsler Memory Scale – Third Edition.  Tr. 254.  Certain test
scores were in the borderline range for intellectual functioning, while other scores where in the
mild mental retardation range for intellectual functioning.  Tr. 258.  Dr. Avery did not diagnose
Hardy with mental retardation.  Tr. 259.  He opined that Hardy's ability to relate to others was
markedly impaired, but that she could relate sufficiently to coworkers and supervisors for simple,
repetitive tasks.  Tr. 259.  Dr. Avery also opined that Hardy was markedly impaired in her ability
to understand, remember, and follow instructions.  Tr. 259.  He further found that Hardy's ability
to maintain attention, concentration, persistence, and pace for simple, repetitive tasks was
markedly impaired.  Tr. 260.  Finally, Dr. Avery opined that Hardy's ability to withstand the
stress and pressures of day-to-day work activities was markedly impaired.  Tr. 260.

On June 26, 2006, state agency physician Frank Orosz reviewed Hardy's file and
assessed her mental condition.  Tr. 261–78.  Dr. Orosz noted that Hardy's IQ scores would put
her in the mild mental retardation range but that the overall record showed that she was
functioning above mental retardation and was capable of working under some stress and getting
along with others. Tr. 263.  He noted that Hardy had no prior testing that resulted in a diagnosis
of mental retardation.  Tr. 263.  Dr. Orosz also observed that Hardy was able to concentrate
adequately during the disability interview process, and opined that she was capable of
performing jobs with one and two step tasks.  Tr. 263.  He diagnosed depression, borderline
intellectual functioning, and personality disorder.  Tr. 268–72.

On June 29, 2006, state agency reviewing physician Kamela Saxena completed a physical
residual functional capacity assessment of Hardy.  Tr. 279–86.  She opined that Hardy was

7

capable of lifting, carrying, pushing, or pulling up to 20 pounds occasionally and 10 pounds frequently; standing, walking, or sitting for about six of eight hours a day; and was otherwise functionally unlimited.  Tr. 280–83.

On December 13, 2006, state agency reviewing physician Cindi Hill, M.D., completed a second physical residual functional capacity assessment of Hardy.  Tr. 313–20.  Dr. Hill opined that Hardy could lift, carry, push, or pull up to 20 pounds occasionally and 10 pounds frequently; stand, walk, or sit for about six of eight hours a day; never climb ladders, ropes, or scaffolds; occasionally stoop; and frequently climb ramps or stairs, kneel, and crouch.  Tr. 314–15.

On June 9, 2009, state agency consultative physician Robert Kalb, M.D., examined Hardy in order to evaluate her physical impairments.  Tr. 406–18.  Dr. Kalb noted that Hardy was involved in a motor vehicle accident in October 1999, ten years prior to the examination.  Tr. 406.  Hardy informed Dr. Kalb that one of her physicians had recommended she undergo an additional surgery, but that she declined.  Tr. 406.  Hardy also stated that she drove herself to the appointment and walked without an assistive device.  Tr. 406.  Dr. Kalb's physical examination was "inconsistent" and showed "submaximal voluntary effort."  Tr. 407.  Dr. Kalb's diagnoses were chronic neck and back pain "with symptoms out of proportion to objective findings," chronic smoking in spite of a diagnosis of sleep apnea, and status post neck fusion with continued neck pain and "disabling subjective complaint of pain."  Tr. 407.

## C.    Testimonial Evidence

On March 5, 2009, Hardy appeared with counsel and testified at the administrative hearing.  Tr. 19–50.  She testified concerning her vocational history and stated that her last job was a sorter at Bax Global.  Tr. 24.  She stated that she had to stop working at that job because she had surgery on her neck.  Tr. 41-42.  Hardy also worked as a food server at a country club.

Tr. 25-26.  She was terminated from that job because she left work early to watch her child.  Tr. 41.

Hardy then testified about her impairments and her past surgery on her neck.  Tr. 29.  She stated that her neck, head, hands, and arms still hurt all of the time.  Tr. 29.  Hardy described the pain as burning, numb, sharp, and aching all of the time.  Tr. 29.  She stated that her fingers are numb all of the time, with it being worse in the mornings.  Tr. 30.  Hardy then testified that she has problems reaching over her head.  Tr. 30.  Hardy also stated that she has problems with her lower back.  Tr. 33.  She testified that she gets dizzy when she crouches, crawls, or does anything that requires her to bend at the back or knees.  Tr. 37.  In addition, Hardy stated that she does not like being around other people.  Tr. 39–40.

Hardy also testified about her activities of daily living.  She stated that she has a driver's license and is able to drive.  Tr. 24.  She can also read and write.  Tr. 24.  Hardy also stated that she watches television and prepares simple meals.  Tr. 39, 43.  She explained that she takes several pain medications for her pain and that medication makes her sleepy.  Tr. 31.  Because of this, she takes naps during the day.  Tr. 31-32, 39, 43.  Hardy previously stated in self-reports that she goes outside to walk and enjoy the birds, makes her bed, does laundry, irons clothes, dusts the house, sweeps the floors, shops for groceries, plays cards, spends time with her children, and cleans her bathroom.  Tr. 173–74, 178–81, 184, 192–93.

## D.    Vocational Evidence

After the administrative hearing, the ALJ solicited information from Renee B. Jubrey, a vocational expert.  Tr. 229-235.  The ALJ provided the VE with a copy of the record and several interrogatories.  Upon review of the record, the VE stated that Hardy previously worked as a club waitress (medium exertional level and unskilled) and routing clerk (medium exertional level and

unskilled).  Tr. 230.  In a hypothetical, the ALJ asked the VE whether a person could perform

any of Hardy's past relevant work or any other work available in the national economy if the

individual had the same vocational factors as Hardy and could perform light work subject to the

following additional limitations: "can never climb ladders, ropes, or scaffolds, can only

occasionally stoop, crouch, and feel, and is limited to simple, repetitive tasks, with only

occasional interaction with coworkers, supervisors, and the general public."  Tr. 231. The VE

stated that such a person could perform Hardy's past work as a routing clerk.  Tr. 231.  The VE

also testified that the person could also perform the following other jobs: housekeeping cleaner

(1,800,000 jobs nationally), marker (628,000 jobs nationally), and mail clerk (1,500,000 jobs

nationally).  Tr. 231–32.

### III.  Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy . . . .

42 U.S.C. § 423(d)(2).   In making a determination as to disability under this definition, an ALJ

is required to follow a five-step sequential analysis set out in agency regulations.  The five steps

can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

10

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

### IV.  The ALJ's Decision

In his August 2009 decision, the ALJ determined that Hardy had not engaged in substantial gainful activity since January 19, 2006, her alleged disability onset date.  Tr. 12.  The ALJ determined that Hardy had the following severe impairments: chronic neck and back pain, obstructive sleep apnea, depression, borderline intellectual functioning, and personality disorder. Tr. 12.  The ALJ found that Hardy did not have an impairment or combination of impairments that met or medically equaled one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.  Tr. 13.  The ALJ next determined that Hardy retained the RFC to perform light work subject

to the following limitations: "claimant is unable to climb ladders, ropes, and scaffolding, can only occasionally stoop, crouch, and feel, and is limited to simple, repetitive tasks, with only occasional interaction with coworkers, supervisors, and the general public." Tr. 14.  The ALJ then found that Hardy was unable to perform her past relevant work.  Tr. 16.  Finally, considering her vocational factors, RFC, and the evidence from the VE, the ALJ found that Hardy was capable of performing work that existed in significant numbers in the national economy.  Tr. 17.  Thus, the ALJ concluded that Hardy was not disabled.  Tr. 18.

## V.  Arguments of the Parties

Hardy objects to the ALJ's decision on four grounds.  First, she asserts that the ALJ erred in finding her impairments did not meet or equal a Listing Impairment.  Second, Hardy argues that the ALJ did not properly weigh treating source opinions.  Third, Hardy objects to the ALJ's conclusion that her complaints of debilitating pain were not fully credible.  Finally, Hardy claims that she was incapable of performing light work given her functional limitations.

In response, the Commissioner argues the ALJ reasonably found that Hardy was not disabled.  The Commissioner contends that substantial evidence supports the ALJ's determination that Hardy did not meet or equal a Listing Impairment.  The Commissioner also argues the ALJ properly weighed the treating source opinions and properly evaluated Hardy's complaints of debilitating pain.  Finally, the Commissioner asserts that the ALJ's determination that Hardy was capable of performing light work is supported by substantial evidence.

## VI.  Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.    Substantial Evidence Supports the ALJ's Determination that Hardy did not Meet or Equal a Listed Impairment**

Hardy contends that the ALJ erred under Step Three in finding that her impairments did not meet or equal Listings 1.04A, 12.05C, and/or 12.05D.  Doc. 9, pp. 10–12.  For a claimant to show that her impairment matches an impairment in the Listings, she must meet all of the specified medical criteria; an impairment that manifests only some of those criteria, no matter how severely, does not qualify.  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  In this case, substantial evidence supports the ALJ's conclusion that Hardy does not have an impairment or combination of impairments that meets or medically equals Listings 1.04 or 12.05.

1.      **Listing 1.04**

Hardy argues that her spinal impairment meets all of the required criteria under Listing

1.04A.  Listing 1.04 describes certain musculoskeletal impairments of the spine and provides, in

relevant part:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis,
> spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral
> fracture), resulting in compromise of a nerve root (including the cauda equina) or
> the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic
> distribution of pain, limitation of motion of the spine, motor loss (atrophy with
> associated muscle weakness or muscle weakness) accompanied by sensory or
> reflex loss and, if there is involvement of the lower back, positive straight-leg
> raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.04A.

The ALJ found that Hardy's impairments did not meet the severity of Listing 1.04,

stating that Hardy did not have the "requisite neurological and physical deficits."  Tr. 13.  In

reaching this conclusion, the ALJ correctly noted that no treating or examining physician had

found that Hardy met or equaled Listing 1.04.  Tr. 13.  The ALJ relied upon the lack of any

specific medical finding in determining that Hardy's impairments did not meet Listing 1.04.  On

review of the record, the ALJ's conclusion is supported by substantial evidence.

A claimant's impairment must meet every element of a Listing before the Commissioner

may conclude that she is disabled at Step Three.  *See* 20 C.F.R. § 404 .1520; *Duncan v. Sec'y of*

*Health & Human Servs.,* 801 F.2d 847, 855 (6th Cir. 1986).  Here, there is no evidence of motor

loss or muscle weakness as required by Listing 1.04A.  In numerous treatment notes, Hardy's

physicians noted little or no muscle weakness or motor loss upon examination.  Tr. 240, 244,

248, 250, 292, 297, 303, 322, 326, 330, 332, 335, 338, 350, 353, 354, 373, 375, 377, 382, 384,

387.  For example, on May 31, 2006, Dr. Reddy stated that there is "no suggestion of muscle

atrophy or dystrophy." Tr. 322.  On August 9, 2006, Dr. Tamirisa found that Hardy had equal

motor strength in all muscle groups in her upper extremities.  Tr. 326.  In addition, when Hardy

complained of muscle weakness in July 2007, Dr. Tamirisa noted that "it wasn't very clear to me

whether it is intentional v. real weakness as the weakness appeared to be somewhat

cogwheeling." Tr. 338.  Further, emergency room records from St. Luke's Hospital from June 3,

2008 show that Hardy had full motor strength.  Tr. 350.   And when state agency physician Dr.

Kalb examined Hardy, he noted that she gave "submaximal voluntary effort" on range of motion

and manual muscle testing.  Tr. 407.

    The medical evidence also reveals that Hardy had no more than minimal limitation in her

spinal range of motion, if any limitation at all.  On May 31, Dr. Reddy found "slightly curtailed"

range of motion.  Tr. 322.  On August 9, 2006, Dr. Tamirisa found only "slightly" limited

cervical spine movement.  Tr. 326.  Emergency room records from St. Luke's Hospital from

June 3, 2008 reveal that Hardy had "full range of motion." Tr. 350.  Finally, the medical

evidence shows that Hardy had normal sensory and reflex testing with few deficits.  Tr. 240, 244,

248, 250, 292, 297, 303, 322, 326, 330, 332, 335, 375, 377, 387.

    Overall, there is ample evidence in the record that Hardy's impairments did not meet all

of the required elements of Listing 1.04A.  The ALJ's decision is therefore supported by

substantial evidence.  *See Bailey v. Comm'r of Soc. Sec.*, No. 09-6389, 2011 WL 850334, at *2

(6th Cir. Mar. 11, 2011) ("To establish the equivalent of nerve-root compression, Bailey must

demonstrate a lack of motor strength, a lack of sensory functions, and a positive straight-leg

raising test, among other things.").

    Notwithstanding the foregoing, Hardy argues that the ALJ erred in his determination

under Listing 1.04A and points to a handful of record citations in asserting that her "spinal

impairment meets all requirements." Doc. 9, pp. 10–11. While this evidence may support Hardy's argument, substantial evidence also supports the ALJ's conclusion that Hardy did not satisfy Listing 1.04A. Based on the applicable standard of review, the ALJ's decision that Hardy's impairments did not meet or equal Listing 1.04A should therefore be affirmed.

### 2. Listing 12.05

Hardy also claims that her mental impairments met Listing 12.05C and Listing 12.05D. Doc. 9, pp. 11-12. Listing 12.05 relates to mental retardation. To qualify as disabled under that Listing, a claimant needs to satisfy <u>both</u> the diagnostic description in the opening paragraph of the Listing <u>and</u> one of the four sets of criteria found in Subparts A through D. *Foster v. Halter*, 279 F.3d 348, 354–55 (6th Cir. 2001). The diagnostic description of Listing 12.05 states:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the development period; i.e. the evidence demonstrates or supports onset of the impairment before age 22.

The additional criteria under Subparts C and D are as follows:

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; or
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 12.05.

In order to satisfy the diagnostic description, which is a threshold requirement, a claimant must prove that she meets the following three factors: (1) significantly subaverage general intellectual functioning; (2) deficits in adaptive functioning; and (3) such deficits initially

manifested themselves during the developmental period, i.e., before age 22.  *Daniels v. Commissioner of Soc. Sec.*, 70 Fed. App'x. 868, 872 (6th Cir. 2003); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A)("Specific symptoms, signs, and laboratory findings in the paragraph A criteria of any of the listings in this section cannot be considered in isolation from the description of the mental disorder contained at the beginning of each listing category.").  If the claimant proves each of these elements, she must then establish that she meets or equals the criteria listed in one of the subsections: A, B, C, or D.  *Daniels*, 70 Fed. App'x. at 872; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

The ALJ found that Hardy's mental impairments did not meet or equal the criteria for Listing 12.05.  Tr. 13.  Substantial evidence exists to support this conclusion.  First, the evidence does not demonstrate or support that Hardy had significantly subaverage general intellectual functioning or deficits in adaptive functioning that manifested themselves before age 22.  Dr. Avery conducted Hardy's IQ testing in May 2006.  Tr. 253, 258.  As the ALJ noted (Tr. 15), Dr. Avery concluded that Hardy's IQ and other scores only put her "in the borderline range" or "mild mental retardation range for intellectual functioning."  Tr. 258-59.  Dr. Avery did not diagnose Hardy with mental retardation.  Tr. 259.  He noted that Hardy took regular classes in high school and later independently obtained her G.E.D. and worked for four years as a waitress and two years as a factory worker.  Tr. 254–55.  Dr. Avery also recorded that Hardy had no problems with flow of conversation, thought, insight, or judgment.  Tr. 257.  He noted that Hardy drove to the evaluation, lived with her father, kept in touch with her four children, shopped, handled her own finances, took care of her own personal needs, washed clothes, cleaned the house, and prepared meals.  Tr. 254–55, 257.

The ALJ relied upon the opinion of state agency reviewing examiner Dr. Orosz in reaching his conclusion that Hardy did not meet Listing 12.05. Tr. 13. In his assessment, Dr. Orosz cited to Dr. Avery's report and noted that Hardy's IQ scores would put her in the mild mental retardation range but the overall record, including her activities reported to Dr. Avery, showed that she had been functioning above the level of mental retardation, was capable of working under some stress, and was able to get along with others. Tr. 263. *See Daniels*, 70 Fed. App'x. at 872 ("The ALJ acknowledged Plaintiff's WAISR performance IQ of 67, but he determined that she nevertheless was not mentally retarded, pointing out Dr. Berg's observation that she clinically appeared to function at a level exceeding her test score."). Dr. Orosz also noted that Hardy was able to concentrate during the disability interview process and opined that she was capable of performing jobs with one and two-step tasks. Tr. 263. He observed that Hardy had no prior testing that resulted in a diagnosis of mental retardation. Tr. 263.

Moreover, there is substantial evidence in the record that Hardy does not presently suffer from deficits in adaptive functioning, which are required to satisfy the diagnostic description of Listing 12.05. Adaptive functioning refers to social skills, communication skills, and daily-living skills. *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x. 672, 677 (6th Cir. 2009); *Turner v. Commissioner of Soc. Sec.,* No. 09-5543, 2010 WL 2294531, at *4 (6th Cir. June 7, 2010). Hardy's daily activities (driving, cooking simple meals, caring for herself, doing laundry, caring for her house, shopping for groceries, spending time with her children), prior work history, and attainment of a high school G.E.D., all show that she does not have deficits in adaptive functioning. The Sixth Circuit has reached that conclusion in numerous similar cases. *See Hayes.,* 357 Fed. App'x. at 677 (plaintiff cared for herself and husband, cooked meals, did laundry, shopped, managed finances, and took public transportation); *Daniels,* 70 Fed. App'x. at

18

872-73 (plaintiff graduated from high school, held a cosmetology license, had prior work experience as a hair stylist and bus driver and work experience demonstrated ability to perform relatively complicated tasks); *Burrell v. Commissioner of Soc. Sec.,* No. 99-4070, 2000 WL 1827799, at *2 (6th Cir. Dec. 8, 2000) (plaintiff remained fairly active, took an interest in the household, had satisfactory relationships with family members, drove and lifted small weights); *see also Bristol v. Astrue,* No. 2:08-CV-13028, 2009 WL 3210928, at *8 (E.D. Mich. Sept. 30, 2009) ("[T]he fact that Plaintiff is able to cook, clean, do the laundry, vacuum, shop and pay bills also suggests that he did not have deficits in adaptive functioning prior to age 22.").

The ALJ reviewed all of the relevant evidence under Listing 12.05 and, even though he did not use the terminology "deficits in adaptive functioning," it is clear that he did in fact consider whether Hardy had any deficits in adaptive functioning.  In his discussion of the different subparts of Listing 12.05, the ALJ stated that "there is no evidence or testimony demonstrating a documented history of a chronic organic mental disorder . . . that has caused more than a minimal limitation of ability to do basic work activities, nor has there been any episodes of decompensation or evidence of the claimant's inability to function outside of a highly supportive living arrangement."  Tr. 13.  The ALJ also stated that "the medical evidence of record does not reflect a dependence on others for personal needs and an inability to follow directions."  Tr. 14.  *See Hardiman v. Astrue*, No. 3:121CV665, 2012 WL 684843 (N.D. Ohio March 2, 2012) (finding that Plaintiff failed to establish that she met or equaled Listing 12.05 because she did not show present deficits of adaptive functioning).

In sum, the ALJ found that Hardy's abilities, including her activities of daily living, were inconsistent with mental retardation and the requirements of Listing 12.05.  There is substantial evidence in the record that Hardy did not suffer subaverage intellectual functioning or deficits of

adaptive functioning, and that such deficits initially manifested during her developmental period, i.e., before she reached age 22, as required by the diagnostic description.  It is Hardy's burden to show that she meets or medically equals an impairment in the Listings and she has not met her burden in this case because she has failed to establish that she satisfies the diagnostic description of Listing 12.05, which is a threshold requirement.  *See, e.g., Evans v. Sec'y of Health & Human Servs.,* 820 F.2d 161, 164 (6th Cir. 1987) (per curiam).  That failure means that, even if she were to satisfy the requirements of subpart (C) or (D) of the Listing, she would nevertheless not meet or equal Listing 12.05.  Accordingly, the Court need not consider whether she meets the criteria outlined in subsections (C) and (D).

**B.**  **Substantial Evidence Supports the ALJ's Credibility Determination**

Hardy asserts that the ALJ erred in finding her testimony was not entirely credible.  Doc. 9, pp. 13–15.  She argues that the proffered reasons given by the ALJ were insufficient to reject her testimony and subjective complaints of debilitating pain.  This argument is without merit.

A disability claim can be supported by a claimant's subjective complaints, as long as there is objective medical evidence of the underlying medical condition in the record.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d at 475.  "[I]f disabling severity cannot be shown by objective medical evidence alone, the Commissioner will also consider other factors, such as daily activities and the type and dosage of medication taken."  *Id.* (citing 20 C.F.R. § 404.1529(c)(3)).  To evaluate the credibility of a claimant's subjective reports of pain, a two-part analysis is used.  20 C.F.R. § 416.929(a); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).  First, the ALJ must determine whether the claimant has an underlying medically determinable impairment which could reasonably be expected to produce the claimant's symptoms.  *Rogers*, 486 F.3d at 247.  Second, if such an impairment exists, then the ALJ must evaluate the intensity,

20

persistence and limiting effects of the symptoms on the claimant's ability to work.  *Id.*  The ALJ

should consider the following factors in evaluating a claimant's symptoms:

1) the individual's daily activities;
2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;
3) factors that precipitate and aggravate the symptoms;
4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.; see also* 20 C.F.R. §§ 404.1529(c) and 416.929(c); Social Security Rule ("SSR") 96-7p,

1996 WL 374186, *3.

However, "an ALJ is not required to accept a claimant's subjective complaints and may

properly consider the credibility of a claimant when making a determination of disability."

*Jones,* 336 F.3d at 476 (citations omitted).  An ALJ's credibility assessment must be supported

by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be

accorded great weight and deference, particularly since an ALJ is charged with the duty of

observing a witness's demeanor and credibility."  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525,

531 (6th Cir. 1997).  It is the province of the ALJ, and not the reviewing court, to evaluate the

credibility of witnesses, including that of the claimant.  *Rogers,* 486 F.3d at 247.  If the ALJ

rejects a claimant's testimony as not being credible, the ALJ must state his reasons so as to make

obvious to the individual and to any subsequent reviewers the weight given to the individual's

statements and the reason for that weight.  *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d

724, 733 (N.D. Ohio 2005); Social Security Rule ("SSR") 96-7p, 1996 WL 374186, *2.

Here, the ALJ undertook the appropriate analysis and determined that Hardy's statements about her limitations lacked credibility.  Tr. 15.  In reaching this determination, the ALJ provided several reasons for discounting Hardy's credibility, including her positive response to conservative treatment, mild examination and test results, her questionable effort upon examination that suggested symptom exaggeration, and her wide array of activities of daily living.  Tr. 15–16.  *See* SSR 96-7p, 1996 WL 374186, at *3 (credibility analysis should include consideration of, among other things, the objective medical record, the claimant's daily activities, the effectiveness of medication, and treatment received).  The ALJ thoroughly discussed the medical records in arriving at an RFC that discounted Hardy's testimony.  None of Hardy's treating physicians, emergency room doctors, or state-agency physicians found extensive medical problems such that Hardy could not perform any work whatsoever.  The ALJ legitimately considered this evidence in making his overall decision as to Hardy's ability to do the physical demands of work and reasonably inferred that her pain and limitations are not as disabling as she alleged.  This analysis is sufficient to sustain the credibility determination made by the ALJ, even if the discussion is somewhat short on a detailed examination of the seven factors set forth in the regulations.  *See, e.g., Cross v. Commissioner of Social Sec.,* 373 F.Supp.2d 724, 733 (N.D. Ohio 2005) (finding that the ALJ need not analyze all seven factors identified in the regulations).

The ALJ's RFC finding is also supported by substantial evidence.  The ALJ found that Hardy could not perform the full range of light work and limited her to work that involved no climbing of ladders, ropes, and scaffolding, only occasional stooping, crouching, and feeling, only simple and repetitive tasks, and only occasional interaction with coworkers, supervisors, and the general public.  Tr. 14.  As summarized above, Hardy's treatment history showed mostly

mild test results, conservative and successful treatment, and questionable effort upon examination. Tr. 15.  With regard to her physical impairments, records from her treating physicians, as well as records from Fulton County Health Center, St. Luke's Hospital, St. Vincent Mercy Medical Center, Northwest Ohio Pain Management Association, Delta Medical Center, and Toledo Neurological Association, showed that Hardy was treated successfully with medication, which stabilized her pain and symptoms.  Tr. 287-89, 321-23, 326-27, 328-37, 338-40, 341-44, 375, 377, 387.  With regard to her mental impairments, substantial evidence in the record, including her minimal treatment for such impairments, as well as her activities of daily living (driving, cooking simple meals, caring for herself, doing laundry, caring for her house, shopping for groceries, spending time with her children), establishes that she was not as limited as she claimed.  The ALJ accounted for all of Hardy's credible limitations from her neck and back pain, sleep apnea, low IQ scores, depression, and other impairments by limiting the range of light work Hardy could perform.

Hardy asserts that her claims of debilitating pain were supported by the record, and she picks out a small number of isolated treatment notes, portions of one medical source opinion, and test results to support her argument.  Doc. 9, p. 15.  However, where the ALJ's credibility determination is supported by substantial evidence, a reviewing court may not re-examine whether the record could support a contrary finding.  *See Casey v. Sec. of HHS*, 987 F.2d 1230, 1233 (6th Cir. 1993).  The ALJ applied the proper factors in making his credibility determination and reasonably concluded that Hardy's pain allegations were not entirely credible.  The ALJ's reasons for making such a finding are supported by substantial evidence.  While the ALJ could have been more precise in tying his discussion of the evidence to his ultimate credibility conclusions, the decision was sufficiently clear to allow a reviewing court to determine the

weight the ALJ gave to Hardy's complaints of pain.

**C.      Hardy has Waived her Argument under the Treating Physician Rule**

Hardy argues that the ALJ did not properly weigh the medical source opinions in reaching her RFC determination.  Doc. 9, pp. 12-13.  Specifically, Hardy asserts that the ALJ erred in failing to give the opinions of her treating sources "greater weight."  Doc. 9, pp. 12–13.  However, Hardy has not identified any specific medical opinion by a treating source regarding her functional abilities that was allegedly given improper weight by the ALJ.  *See Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007) (ALJ under no duty to grant medical opinion great weight when there is no opinion given regarding functional abilities).  Instead, Hardy generically states that more weight should have been given to the "records, opinions, statements, and treatment notes" of several of her treating sources.  Doc. 9, pp. 12-13.  She cites to no evidence from the record demonstrating why any of her treating source's opinions should be given greater weight, or what limitations should have been included in the ALJ's RFC finding.

"[I]ssues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."); *Meridia Prods. Liab. Litig. v. Abbott Labs*., 447 F.3d 861, 868 (6th Cir. 2006); *see also Erhart v. Sec'y of Health & Human Servs.*, 989 F.2d 534, 537 n. 5 (7th Cir. 1992) (applying waiver rule because judges need not devote time to "discussion of argument, raised if at all, 'in a very opaque manner.'").  Hardy has failed to develop her treating physician argument beyond a cursory discussion of the issue and failed to identify what specific medical opinions the ALJ improperly weighed.  The Court will not speculate as to what Hardy's arguments might be.  This issue is therefore deemed waived.

**D.     Substantial Evidence Supports the ALJ's Determination under Step Five of the
Sequential Analysis**

Finally, Hardy argues that the ALJ failed to meet the burden of proof at Step Five
because the jobs he listed do not account for her limitations.  Doc. 9, pp. 16–17.  This argument
is also meritless.

At Step Five of the sequential analysis, the ALJ must determine whether, in light of the
claimant's residual functional capacity, age, education, and past work experience, the claimant
can make an adjustment to other work.  20 C.F.R. § 404.1520(a)(4).  The burden shifts to the
Commissioner at Step Five to prove the existence of a significant number of jobs in the national
economy that a person with the claimant's limitations could perform.  *See, e.g., Her v. Comm'r of
Soc. Sec., 203 F.3d 388, 391 (6th Cir.1999)*.  To satisfy this burden, the ALJ can rely on the
testimony of a vocational expert, as long as it is in response to an accurate hypothetical of the
claimant's physical and mental limitations.  *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d
777, 779 (6th Cir. 1987).  In formulating the hypothetical, the ALJ only needs to incorporate
those limitations he accepts as credible.  *See* C*asey v. Sec'y of Health & Human Servs.*, 987 F.2d
1230, 1235 (6th Cir. 1993).

Here, the ALJ's hypothetical to the VE included all of the limitations provided for in his
RFC finding for Hardy and, as discussed above, that RFC finding is supported by substantial
evidence.  Based on the hypothetical, the VE stated that a person with Hardy's personal and
vocational characteristics and RFC could perform work as a housekeeping cleaner (1,800,000
jobs nationally), marker (628,000 jobs nationally), and mail clerk (1,500,000 jobs nationally).
Hardy challenges this finding, arguing that the limitations imposed by her neck and back pain,
sleep apnea, low IQ scores, depression, and other impairments would preclude her from such
work.  This argument merely restates Hardy's challenges to the RFC finding, which are

addressed and rejected above.  Moreover, an ALJ need not include limitations that were found to be unsupported by the evidence or not credible.  *See Casey*, 987 F.2d at 1235.  Therefore, the ALJ did not err, and the VE's testimony - given in response to a hypothetical that reasonably reflected all the limitations that the ALJ found valid and credible - constituted substantial evidence capable of supporting the Step Five finding.

## VII.  Conclusion and Recommendation

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff Susan L. Hardy's applications for DIB and SSI should be **AFFIRMED**.

Dated: April 11, 2012

_____
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).